**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AUTUMN METCALF,
c/o Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Avenue NW Suite 1000
Washington, D.C. 20006

*Plaintiff*,

*v.*

JOHN F. KENNEDY CENTER
FOR THE PERFORMING ARTS
2700 F Street NW
Washington, D.C. 20566,

*Defendant*.

Civil Action No. ___________________

DEMAND FOR JURY TRIAL

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

Plaintiff Autumn Metcalf, by and through counsel, files this civil complaint and demand for jury trial against Defendant John F. Kennedy Center for the Performing Arts, for discrimination, retaliation, and the creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.

**THE PARTIES**

1. Plaintiff Autumn Metcalf, a Black woman who identifies her sexual orientation as lesbian/queer, was a "trust employee" of Defendant John F. Kennedy Center for the Performing Arts. Ms. Metcalf worked as a Representative in the Subscriptions Office from approximately May 2022 to December 4, 2025. As a trust employee, Ms. Metcalf's position was not funded by federal funds.

2. Defendant John F. Kennedy Center for the Performing Arts ("Defendant" and/or "Kennedy Center") is a performing arts complex in Washington, D.C., which Congress established as

a "living memorial" to President John F. Kennedy. Defendant is a "bureau" of the Smithsonian Institution, *see* 20 U.S.C. § 76h(a)(1), and thus, Defendant is a federal agency for the purpose of Title VII enforcement.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, and under 28 U.S.C. § 1331.
4. The Court has personal jurisdiction over Defendant because Defendant is located in Washington, D.C. and regularly conducts business within this District.
5. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) because the alleged unlawful employment discrimination occurred in Washington, D.C.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6. Ms. Metcalf has timely exhausted her administrative remedies under 29 C.F.R. § 1614.105. Specifically, on December 17, 2025, Ms. Metcalf contacted Defendant's designated equal employment opportunity ("EEO") administrator, the Smithsonian Institution Office of Equal Employment and Supplier Diversity, within 45 days of her November 18, 2025, suspension, one of the personnel actions giving rise to Ms. Metcalf's complaint.
7. On the same day, December 17, 2025, Smithsonian Institution Attorney Advisor Jillian Carilli informed Ms. Metcalf that the "Smithsonian Institution does not process or accept discrimination complaints from Kennedy Center employees," even though Defendant's written policies identified the Smithsonian Institution as the appropriate contact. Carilli directed Ms. Metcalf to contact Defendant's Associate General Counsel Laura M. Hagan and noted that the Kennedy Center could advise Ms. Metcalf "on filing an administrative EEO discrimination complaint."

8. On December 19, 2025, and December 22, 2025, Ms. Metcalf, through counsel, contacted Defendant's Human Resources, the Office of General Counsel, and Laura Hagan directly, requesting the contact information for the Kennedy Center's EEO Counselor. Although Defendant read Ms. Metcalf's communications—as documented by read receipts—Defendant refused to provide Ms. Metcalf with the EEO Counselor's contact information as required by 29 C.F.R. § 1614.102(b)(7).

9. On January 2, 2026—still within 45 days of Ms. Metcalf's November 18, 2025, suspension—Ms. Metcalf's counsel reminded Associate General Counsel Hagan of the Kennedy Center's legal obligation to "process Ms. Metcalf's complaint of discrimination so that she may proceed with the formal equal employment opportunity process."

10. Associate General Counsel Hagan never responded to counsel's correspondence, and Defendant continued to refuse to process Ms. Metcalf's EEO complaint, which denied Ms. Metcalf the opportunity to participate in EEO counseling pursuant to 29 C.F.R. § 1614.105(a).

11. Defendant intentionally withheld vital information from Ms. Metcalf and never notified her of her right to file a formal complaint as required by federal regulations. *See* 29 C.F.R. § 1614.105(b).

12. As evidenced by Ms. Metcalf's December 2025 and January 2, 2026, communications, she diligently pursued her rights, but Defendant's obstructive behavior and refusal to process her EEO complaint—or even to identify the correct addressee for such a complaint—made it impossible for Ms. Metcalf to file a formal EEO complaint pursuant to 29 C.F.R. § 1614.106.

13. Ms. Metcalf's diligence and Defendant's conduct as described in the preceding paragraphs suffice to establish that Ms. Metcalf has exhausted her administrative remedies.
14. Based on Defendant's refusal to process Ms. Metcalf's EEO complaint pursuant to federal sector EEO procedures and based on the fact that Ms. Metcalf was not a federal employee, Ms. Metcalf reasonably inferred that she was required to follow the private-sector complaint process, 42 U.S.C. § 2000e-5.
15. Accordingly, on February 25, 2026, Ms. Metcalf submitted an inquiry to the U.S. Equal Employment Opportunity Commission ("EEOC").
16. On April 20, 2026, Ms. Metcalf filed a charge of discrimination with the EEOC.
17. On June 23, 2026, Ms. Metcalf and Defendant participated in a mediation through the EEOC's Alternative Dispute Resolution program, but the parties were unable to resolve the matter.
18. Although Associate General Counsel Hagan never responded to Ms. Metcalf's correspondence, Hagan attended the EEOC mediation on Defendant's behalf.
19. On July 29, 2026, the EEOC issued a Notice of Right to Sue letter to Ms. Metcalf, finding that it lacked jurisdiction over her charge of discrimination due to the Kennedy Center's status as a quasi-federal entity, even though Ms. Metcalf was a private-sector employee.
20. Ms. Metcalf now timely files the instant Complaint within 90 calendar days of the EEOC's issuance of the Notice of Right to Sue.

## STATEMENT OF FACTS

21. Plaintiff Autumn Metcalf is a Black woman who identifies her sexual orientation as lesbian/queer.
22. Defendant was aware of Ms. Metcalf's identity as a lesbian/queer Black woman.

23. Defendant employed Ms. Metcalf from approximately May 2022 to December 4, 2025.
24. For the entirety of Ms. Metcalf's employment, she worked as a Representative in Defendant's Subscriptions Office.
25. When Ms. Metcalf worked for Defendant, she was a trust employee; Ms. Metcalf was not a federal employee.
26. From approximately February 2025 to December 4, 2025, Carissa L. Helmer served as Ms. Metcalf's direct supervisor.
27. Supervisor Helmer is a white, heterosexual woman.
28. On or about February 3, 2025, the Kennedy Center appointed Stephanie M. Atkinson as "Senior Manager."
29. Manager Atkinson is a white, heterosexual woman.
30. Manager Atkinson served as Ms. Metcalf's second-level supervisor from February 2025 to December 4, 2025.
31. From the outset, Manager Atkinson was hostile toward Ms. Metcalf. Manager Atkinson never greeted Ms. Metcalf at meetings and often appeared visibly annoyed whenever Ms. Metcalf spoke. By contrast, Manager Atkinson was cordial toward colleagues who were not queer Black women.
32. From February 2025 to December 4, 2025, Ms. Metcalf was the only Black woman who worked in the Subscriptions Office.
33. From February 2025 to December 4, 2025, Ms. Metcalf was the only employee in the Subscriptions Office who openly identified as a lesbian/queer.
34. As early as February 2025 and on several other occasions, Supervisor Helmer told Ms. Metcalf that Manager Atkinson frequently referred to herself as "the bad cop."

35. Manager Atkinson's self-description proved apt: she frequently patrolled Ms. Metcalf's workspace—hovering near her cubicle and peering in when she believed Ms. Metcalf was not aware that Manager Atkinson was watching her. No such surveillance was directed at employees who were not queer Black women.

36. Since approximately June 2022, Ms. Metcalf had displayed various messages on her dry-erase board (which was approximately 12 inches by 9 inches) that hung on the outer wall of her cubicle. She often wrote jokes, catchphrases from movies and television shows, and quotes from prominent civil rights activists such as Dr. Martin Luther King Jr. and James Baldwin. In approximately February or March 2025, Ms. Metcalf displayed a countdown to the next presidential election on the dry-erase board.

37. On March 12, 2025, Supervisor Helmer met with Ms. Metcalf to discuss her dry-erase board. During the meeting, Supervisor Helmer expressly stated that the discussion was "not a disciplinary meeting" and that Ms. Metcalf was "not in trouble." Supervisor Helmer instructed Ms. Metcalf to remove the dry-erase board from outside her cubicle, and Ms. Metcalf complied by moving it inside her cubicle. Ms. Metcalf also erased the countdown to the next presidential election. Ms. Metcalf asked Supervisor Helmer whether Manager Atkinson had directed her to remove the dry-erase board, and Helmer replied, "I can't tell you who told me."

38. On March 13, 2025, Supervisor Helmer emailed Ms. Metcalf, copying Manager Atkinson, stating, *inter alia*, that the March 12, 2025, meeting about Ms. Metcalf's dry-erase board was, in fact, a "verbal warning."

39. On or about July 15, 2025, Manager Atkinson's disparate policing of Ms. Metcalf continued to escalate. Manager Atkinson stood over Ms. Metcalf, who was seated in her cubicle, and ordered her to remove her dry-erase board entirely. Manager Atkinson threatened Ms. Metcalf with "insubordination" if she refused and said that Ms. Metcalf's quotes were "negative." At the time, Ms. Metcalf had quotes from the science-fiction television series *The Twilight Zone* written on the dry-erase board inside her cubicle. Ms. Metcalf complied, even though other staff members, who were not queer Black women, had similar displays and personal items in their cubicles without interference.

40. On the same day that Manager Atkinson ordered Ms. Metcalf to remove her dry-erase board, one of Ms. Metcalf's coworkers who is not a queer Black woman, Ellen Schiavone, had printouts in her cubicle that read, "DOES ANYONE KNOW OF A GOOD JOB FOR SOMEONE THAT HATES PEOPLE?" and "MY EYES ARE IN THE BEST SHAPE OUT OF ALL MY BODY PARTS! I roll them at least 86 times a day." Manager Atkinson did not order Coworker Schiavone to remove her printouts.

41. After complying with Manager Atkinson's directive to remove her dry-erase board, Ms. Metcalf immediately raised her concerns of disparate treatment with Union Representative Francisco Borja.

42. On July 16, 2025, Ms. Metcalf's union, IATSE Local 868, wrote to Manager Atkinson on Ms. Metcalf's behalf, expressly stating that Ms. Metcalf had "rising concerns about racial discrimination in the office" and requesting to meet with Manager Atkinson to discuss Ms. Metcalf's concerns.

43. Manager Atkinson did not respond; instead, Defendant's Associate General Counsel Laura Hagan intervened and asserted that she would attend any meeting, even though she had not been invited.

44. Associate General Counsel Hagan also stated that she would be "taking an active role in labor issues going forward."

45. By taking an "active role in labor issues" at the Kennedy Center, Associate General Counsel Hagan was acting outside her role as Defendant's legal advisor and instead serving as a decision-maker.

46. On July 17, 2025—a mere day after Ms. Metcalf raised concerns about race discrimination—Supervisor Helmer emailed Ms. Metcalf, copying Manager Atkinson and Director of Sales and Ticketing Services Derek Younger, falsely accusing her of being away from her desk "for approximately 25 minutes" and warning her that she faced "further documentation or progressive discipline."

47. Coworkers, who were not queer Black women, routinely left their workstations for comparable or longer periods, but they received no such warnings.

48. On or about July 21, 2025, without any explanation, Manager Atkinson removed the toaster oven that had been provided to the Subscriptions Office staff. Ms. Metcalf regularly used the toaster oven to warm up her lunch, a fact of which Manager Atkinson was aware.

49. On July 30, 2025, IATSE Local 868 convened a meeting with Defendant (with Ms. Metcalf present) to address Ms. Metcalf's concerns of race discrimination.

50. Manager Atkinson, Associate General Counsel Hagan, Director Younger, and Senior Vice President of Marketing Kim Cooper attended the July 30, 2025, meeting and transformed it into a disciplinary proceeding against Ms. Metcalf. Associate General Counsel Hagan

mischaracterized Ms. Metcalf's dry-erase board as "threatening" towards Manager Atkinson—a characterization rooted in the racist stereotype that Black women are "threatening" and violent. Hagan also dismissed Ms. Metcalf's concerns of workplace discrimination and asserted, without merit, that Ms. Metcalf's dry-erase board could be perceived as "a hostile work environment."

51. On July 31, August 6, 2025, and on multiple additional occasions, Manager Atkinson, Supervisor Helmer, and Assistant Manager Jeffery Williams documented the length of Ms. Metcalf's breaks, monitored her whereabouts in the office, and audited her arrival and departure times. That management directed this heightened scrutiny exclusively at Ms. Metcalf—the office's only queer Black woman—is consistent with racial profiling and the racist stereotype that Black women are inherently prone to misconduct.

52. On September 24, 2025, shortly after Ms. Metcalf returned from an approved four-week leave, Supervisor Helmer issued Ms. Metcalf a "verbal warning" for placing a few mailing labels "sideways and not centered," a level of scrutiny to which no comparable coworker was subjected.

53. On October 9, 2025, Manager Atkinson entered Ms. Metcalf's cubicle uninvited and began lamenting about recent departures of Black employees from the Kennedy Center. While discussing Senior Vice President of Marketing Cooper's abrupt departure, Manager Atkinson said, "another Black woman gone," then appeared to cry—apparently expecting Ms. Metcalf to comfort her. Manager Atkinson's conduct reflects that she viewed Ms. Metcalf as a "mammy," the racist stereotype that Black women will readily serve as emotional caretakers for white people without reciprocity and without regard for the Black woman's own emotional state or needs.

54. When Ms. Metcalf sat in silence, Manager Atkinson abruptly stopped crying, switched to disparaging the Kennedy Center's openly gay interim president, Richard Grenell, and referred to his assistants as his "twinks" before leaving. Manager Atkinson's reference to Grenell's staff as "twinks"—made to a queer woman—was homophobic and offensive.

55. On October 29, 2025, at Manager Atkinson's directive, Assistant Manager Williams falsely accused Ms. Metcalf of arriving late for her shift and instructed her to log 17 minutes of leave—leave she had not used, having arrived at 9:10 a.m., 20 minutes early to her shift.

56. When Ms. Metcalf refused to log fictitious leave, Manager Atkinson issued Ms. Metcalf a "Written Warning" on October 29, 2025.

57. Kate Ferrell, one of Ms. Metcalf's white coworkers, frequently arrived late to her shift, but Manager Atkinson and Supervisor Helmer did not discipline or threaten Ferrell.

58. On November 4, 2025, Manager Atkinson and Supervisor Helmer began documenting the amount of time Ms. Metcalf spent in the restroom—a humiliating intrusion that had no basis in a legitimate workplace policy.

59. When IATSE Local 868 conducted an inquiry into management's scrutiny of Ms. Metcalf, Ms. Metcalf's non-Black coworkers confirmed management did not subject them to similar scrutiny. For example, Coworker Schiavone reported to the union:

> [I]t seems like management has been hyper-focused on [Ms. Metcalf] lately. We all step away from our desks from time to time, sometimes for a minute, sometimes for over 10 minutes, but I've never received an email from management questioning why I stepped away, and I know [Ms. Metcalf] has.
>
> [. . .]
>
> I wanted to share this because the episode where management went after [Ms. Metcalf] for the messages on her whiteboard, but never said anything to me about the sarcastic and dark humor quotes I have all over my cubicle, really made things feel unfair to her.

60. On or about November 10, 2025, Ms. Metcalf met with the Kennedy Center's Office of Accessibility to discuss an unrelated issue. Ms. Metcalf told management officials Helmer and Williams that she had "a meeting with Human Resources."

61. Supervisor Helmer's usual practice was to notify Manager Atkinson and Director Younger of Ms. Metcalf's workplace activities. Supervisor Helmer followed this usual practice by notifying Manager Atkinson and Director Younger of Ms. Metcalf's meeting with Human Resources on or about November 10, 2025.

62. Based on Ms. Metcalf's July 16, 2025, complaint of discrimination, Manager Atkinson and Director Younger believed that Ms. Metcalf had reported discrimination to Human Resources on or about November 10, 2025.

63. On November 18, 2025, Director Derek Younger suspended Ms. Metcalf from work without pay after accosting her in the workplace, elevating his voice, and falsely accusing her of being "loud" and "disrespectful"—racist tropes that are often inflicted upon Black women.

64. Director Younger's outburst was completely illogical. Immediately before Younger's outburst, Ms. Metcalf was staffing the Subscriptions Office's customer service window. Defendant's in-house mail carrier approached the window, and Ms. Metcalf briefly conversed with the carrier before stepping away to retrieve the office's outgoing mail. After finding the mail already collected, she told the mail carrier, "Someone must have come and got it." Director Younger, overhearing this exchange, interjected without basis and snapped, "No one came and got me; I'm using the printer!" Confused by this non-sequitur, Ms. Metcalf asked Director Younger what he meant and then repeated her initial comment to the mail carrier. At that point, Director Younger escalated without provocation.

65. During Director Younger's outburst, he stopped less than a foot away from Ms. Metcalf, blocking the exit, and loomed over her while she sat at the customer service window. In an angry tone, Director Younger snarled, "you won't be getting paid for the rest of the day and tomorrow." He then demanded that Ms. Metcalf gather her belongings and go home. During the confrontation, Ms. Metcalf feared that Director Younger would physically assault her; she felt humiliated; and she was mortified by Director Younger's behavior.

66. One of Ms. Metcalf's white male coworkers, Timothy Sauline, witnessed Director Younger's angry outburst on November 18, 2025, and Coworker Sauline reported that Manager Younger was the instigator and aggressor:

> It felt like an escalation from 1 to a million that was unjustified. I dont know what [Ms. Metcalf] was doing in the window but whatever it was [Ms. Metcalf] should have been given more time or room to explain herself before essentially kicking her out of the office with no explanation to be shared with anyone.
>
> I wasn't sure if I could do anything productive the rest of the day after that happened. Like could I get yelled at by Derrick [*sic*] for my tone and get sent home randomly?

67. Defendant failed to pay Ms. Metcalf for part of the day on November 18, 2025, and for the entire day on November 19, 2025, resulting in Ms. Metcalf's lost wages.

68. On November 20, 2025, immediately after Ms. Metcalf returned from her November 18, 2025, suspension, Manager Atkinson and Supervisor Helmer disciplined Ms. Metcalf again by issuing her a "Final Warning" and suspending her for 14 days without pay based on fabricated "attendance/timekeeping issues."

69. On the same day, Manager Atkinson directed security to escort Ms. Metcalf from the building, despite Ms. Metcalf's willingness to leave voluntarily and the absence of any conduct warranting a security escort. Ms. Metcalf felt publicly humiliated as security escorted her out of the building.

70. Defendant failed to pay Ms. Metcalf from November 20, 2025, through December 3, 2025, resulting in Ms. Metcalf's lost wages.

71. On December 4, 2025, the date Ms. Metcalf was scheduled to return to work, she resigned from her position and expressly stated that the reason for her resignation was because "Stephanie Atkinson has created such an unbearable hostile work environment, based on my intersecting identity as a queer, Black woman, that no reasonable person would tolerate such working conditions."

72. On December 4, 2025, Manager Atkinson again directed security to escort Ms. Metcalf through the building when she merely sought to retrieve her personal belongings from her cubicle after resigning from her position.

73. Ms. Metcalf's coworkers observed Ms. Metcalf being escorted by security. Coworker Ferrell asked Supervisor Helmer, "why they were treating [Ms. Metcalf] like a criminal," to which Supervisor Helmer responded, "I can't speak on it."

74. Similarly, after observing security escorting Ms. Metcalf through the building on December 4, 2025, Coworker Sauline apologized to Ms. Metcalf for management's behavior and stated, "Makes me so angry to see it happen. Like you're a criminal or something."

75. Management treated no comparable coworker as a "criminal."

76. On December 17, 2025, Ms. Metcalf, through counsel, contacted the Smithsonian Institution Office of Equal Employment and Supplier Diversity—the entity identified in the Kennedy Center's published EEO policy as the proper recipient of discrimination complaints for all Kennedy Center employees.

77. Despite Defendant's policy identifying the Smithsonian Institution as the appropriate contact, Attorney Advisor Jillian Carilli informed Ms. Metcalf that the "Smithsonian Institution does not process or accept discrimination complaints from Kennedy Center employees" and redirected Ms. Metcalf to contact Associate General Counsel Hagan—the same Kennedy Center official who had interfered with Ms. Metcalf's July 16, 2025, complaint of discrimination and subjected Ms. Metcalf to racist stereotypes on July 30, 2025.

78. As described in Paragraph Numbers 6-20, above, and incorporated by reference here, Associate General Counsel Hagan discouraged Ms. Metcalf from reporting discrimination by obstructing and interfering with her access to the Kennedy Center's EEO program.

79. In addition, on December 22, 2025, Ms. Metcalf's counsel emailed Assistant General Counsel Hagan, explaining that the contact information for the Kennedy Center's EEO Office posted on its public website was inaccurate and requesting the correct contact information.

80. Instead of providing the correct contact information for its EEO Counselor, sometime between December 22 and 30, 2025, the Kennedy Center removed the EEO page from its website altogether.

81. Associate General Counsel Hagan's obstruction and interference made it impossible for Ms. Metcalf to file a formal EEO complaint.

## CAUSES OF ACTION

### COUNT I

**Retaliation in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16 (November 18, 2025, Suspension)**

82. Ms. Metcalf realleges and incorporates by reference each and every factual allegation set forth in Paragraph Numbers 21-81 as if fully set forth herein.

83. Ms. Metcalf engaged in activity protected by Title VII of the Civil Rights Act on July 16 and July 30, 2025, of which Defendant was aware, by opposing what she reasonably believed to be disparate treatment based on one or more of her protected classes.

84. Shortly after Ms. Metcalf engaged in protected activity, Defendant took materially adverse actions against her by accosting her in a threatening manner and suspending her without pay on November 18, 2025.

85. Defendant has failed to state any legitimate, nondiscriminatory reason for accosting Ms. Metcalf in a threatening manner, and no legitimate, nondiscriminatory reason exists.

86. Defendant's stated reason for suspending Ms. Metcalf on November 18, 2025, was false and a pretext for unlawful discrimination.

87. As a result of the adverse actions, Ms. Metcalf has suffered lost wages, emotional distress, mental anguish, embarrassment, inconvenience, undue stress, anxiety, reputational harm, and other damages.

### COUNT II

**Retaliation in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16 (November 20, 2025, Suspension)**

88. Ms. Metcalf realleges and incorporates by reference each and every factual allegation set forth in Paragraph Numbers 21-81 as if fully set forth herein.

89. Ms. Metcalf engaged in activity protected by Title VII of the Civil Rights Act on July 16 and July 30, 2025, of which Defendant was aware, by opposing what she reasonably believed to be disparate treatment based on one or more of her protected classes.

90. Shortly after Ms. Metcalf engaged in protected activity, Defendant took materially adverse action against her by suspending her without pay on November 20, 2025.

91. Defendant's stated reason for suspending Ms. Metcalf on November 20, 2025, was false and a pretext for unlawful discrimination.

92. As a result of Defendant's November 20, 2025, suspension, Ms. Metcalf has suffered lost wages, emotional distress, mental anguish, embarrassment, inconvenience, undue stress, anxiety, reputational harm, and other damages.

## COUNT III

### Retaliation in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16 (Obstruction and Interference)

93. Ms. Metcalf realleges and incorporates by reference each and every factual allegation set forth in Paragraph Numbers 21-81 as if fully set forth herein.

94. Ms. Metcalf engaged in activity protected by Title VII of the Civil Rights Act on July 16, July 30, and December 4, 2025, of which Defendant was aware, by opposing what she reasonably believed to be disparate treatment based on one or more of her protected classes.

95. Ms. Metcalf also engaged in protected activity on December 17, 19, and 22, 2025, and on January 2, 2026, by stating her intent to participate in the Kennedy Center's EEO program.

96. Shortly after Ms. Metcalf engaged in protected activity, Defendant, through Associate General Counsel Laura Hagan, took materially adverse action against Ms. Metcalf by obstructing and interfering with her access to the Kennedy Center's EEO program and preventing her from filing an EEO complaint.

97. Defendant has failed to state a legitimate, nondiscriminatory reason for obstructing and interfering with Ms. Metcalf's access to the Kennedy Center's EEO program, and no legitimate, nondiscriminatory reason exists.

98. As a result of Defendant's retaliatory obstruction and interference, Ms. Metcalf has suffered emotional distress, mental anguish, inconvenience, undue stress, anxiety, and other damages.

## COUNT IV

### Discrimination on the Basis of Ms. Metcalf's Intersecting Identities as a Queer Black Woman in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16 (November 18, 2025, Suspension)

99. Ms. Metcalf realleges and incorporates by reference each and every factual allegation set forth in Paragraph Numbers 21-81 as if fully set forth herein.

100. As a queer Black woman, Ms. Metcalf is a member of one or more protected classes.

101. Ms. Metcalf was qualified for her position and performed her duties satisfactorily.

102. Defendant subjected Ms. Metcalf to an adverse employment action when it suspended her without pay on November 18, 2025.

103. Defendant treated similarly situated employees outside of Ms. Metcalf's protected classes more favorably.

104. Defendant's stated reason for suspending Ms. Metcalf on November 18, 2025, was false and a pretext for unlawful discrimination.

105. As a result of the November 18, 2025, suspension, Ms. Metcalf has suffered lost wages, emotional distress, mental anguish, embarrassment, inconvenience, undue stress, anxiety, reputational harm, and other damages.

## COUNT V

**Discrimination on the Basis of Ms. Metcalf's Intersecting Identities as a Queer Black Woman in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16 (November 20, 2025, Suspension)**

106. Ms. Metcalf realleges and incorporates by reference each and every factual allegation set forth in Paragraph Numbers 21-81 as if fully set forth herein.

107. As a queer Black woman, Ms. Metcalf is a member of one or more protected classes.

108. Ms. Metcalf was qualified for her position and performed her duties satisfactorily.

109. Defendant subjected Ms. Metcalf to an adverse employment action when it suspended her without pay on November 20, 2025.

110. Defendant treated similarly situated employees outside of Ms. Metcalf's protected classes more favorably.

111. Defendant's stated reason for suspending Ms. Metcalf on November 20, 2025, was false and a pretext for unlawful discrimination.

112. As a result of Defendant's November 20, 2025, suspension, Ms. Metcalf has suffered lost wages, emotional distress, mental anguish, embarrassment, inconvenience, undue stress, anxiety, reputational harm, and other damages.

## COUNT VI

**Hostile Work Environment Based on Ms. Metcalf's Intersecting Identities as a Queer Black Woman and in Retaliation for Her Protected Oppositional Activity in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16**

113. Ms. Metcalf realleges and incorporates by reference each and every factual allegation set forth in Paragraph Numbers 21-81 as if fully set forth herein.

114. From February 2025 through December 2025, Stephanie Atkinson, Carissa Helmer, Jeffery Williams, Derek Younger, and Laura Hagan subjected Ms. Metcalf to a continuous pattern of discriminatory and/or retaliatory harassment, including but not limited to, racist stereotyping, unrelenting workplace surveillance, frequent threats of disciplinary action, intimidation, fabricated disciplinary charges, public humiliation, and homophobic remarks based on one or more of Ms. Metcalf's protected classes.

115. Management's harassment altered the terms and conditions of Ms. Metcalf's employment, creating a working environment that any reasonable person would find hostile, intimidating, and abusive.

116. As a result of the hostile work environment created by Defendant's harassment, Ms. Metcalf has suffered lost wages, emotional distress, mental anguish, embarrassment, inconvenience, undue stress, anxiety, reputational harm, and other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Metcalf respectfully requests that the Court enter judgment in her favor and award her the following relief:

a. Declaratory judgment finding that Defendant violated Title VII of the Civil Rights Act,

b. Back pay with interest for any and all lost wages and benefits,

c. Compensatory damages in an amount to be shown at trial for the emotional distress, mental anguish, pain and suffering, inconvenience, embarrassment, undue stress, anxiety, and the reputational harm caused by Defendant's unlawful conduct,

d. Expungement of any and all discriminatory disciplinary actions recorded in Ms. Metcalf's personnel file at the Kennedy Center,

e. Costs and reasonable attorneys' fees incurred, and

f. Any other relief this Court deems just and proper.

**JURY DEMAND**

Ms. Metcalf demands a trial by jury on any and all issues so triable.

Date: October 27, 2026

Respectfully submitted,

/s/ Sacred B. Huff

______________________________

Sacred B. Huff (D.C. Bar No. 1671434)
Samantha Sloane (D.C. Bar No. 90004037)
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue NW Suite 1000
Washington, D.C. 20006
Tel: (202) 331-9260
Fax: (866) 452-5789

*Counsel for Plaintiff*